UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM WOELK,

          Plaintiff,          Civil Action No. 13-12411
                                       Honorable Robert H. Cleland
                                       Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

# REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 14]

Plaintiff William Woelk ("Woelk") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [12, 14], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**      **RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Woelk was not disabled under the Act during the relevant time period. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Woelk's Motion for Summary Judgment [12] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On April 6, 2012, Woelk filed an application for DIB, alleging disability beginning on December 20, 2004. (Tr. 124-29). His claim was initially denied on April 26, 2012. (Tr. 75-79). Thereafter, Woelk filed a timely request for an administrative hearing, which was held on October 22, 2012, before ALJ Michael Dunn. (Tr. 32-67). Woelk (represented by attorney Andrea Hamm) testified at the hearing, as did vocational expert Harry Cynowa. (*Id.*). On November 5, 2012, the ALJ issued a written decision finding that Woelk was not disabled prior to December 31, 2010 (his date last insured). (Tr. 21-28). On April 24, 2013, the Appeals Council denied review. (Tr. 1-5). Woelk filed for judicial review of the final decision on June 3, 2013. (Doc. #1).

### B. Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months,

2

>and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
>Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps ….  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.    Background**

*1.    Woelk's Reports and Testimony*

At the time of the administrative hearing, Woelk was 55 years old.  (Tr. 39).  He testified that he lived in a townhouse with his minor children.  (Tr. 38-39).  He graduated from high school and earned a certificate in automotive repair.  (Tr. 39).

When completing disability reports in 2012, Woelk indicated that his ability to work was limited by brain adenocarcinoma metastasis, pituitary macroadenoma, and primary lung carcinoma. (Tr. 155).  However, he testified that he last worked in December of 2004, stopping because he began experiencing double vision at that time, which was caused by a sixth cranial nerve palsy (secondary to a pituitary tumor).  (Tr. 41-43).  He received treatment for the pituitary tumor, and it spontaneously self-destroyed in 2005, leaving him with only an adrenal insufficiency (for which he took hormone replacement medication).  (Tr. 44).  He obtained prism

glasses for a period of time, which corrected his double vision; and, even without the glasses, he was able to read if he covered one eye. (Tr. 43). As a result, Woelk testified that, by May or June of 2005, he would have been physically able to work if he had been able to find a job. (Tr. 43-47). Woelk further testified that, between 2008 and the end of 2010, he did not receive any medical treatment. (Tr. 59). In March of 2012, however, he suddenly experienced balance difficulties and dizziness, at which time he was admitted to the hospital and diagnosed with lung cancer, which had metastasized to his brain. (Tr. 37-38, 59-60).

### 2. *Medical Evidence*

On December 20, 2004, Woelk presented to the emergency room at Henry Ford Wyandotte Hospital with complaints of vomiting, blurred vision, headaches, and dizziness. (Tr. 192-93). On examination, he had bilateral cranial nerve VI palsies. (Tr. 250). A brain MRI revealed a mass with characteristics suggestive of a pituitary macroadenoma. (*Id.*). When he was discharged three days later, it was expected that he could return to work by January 25, 2005. (*Id.*). Subsequently, Woelk was scheduled for surgery to remove this mass on February 18, 2005; an MRI taken that morning, however, revealed that the mass had "collapsed." (Tr. 219). As a result, surgery was cancelled. (*Id.*). A few days later, when he presented to an endocrinologist, he reported that he was "feeling fine," with normal energy, and although his double vision persisted, it had improved. (Tr. 217). A follow-up MRI taken on December 11, 2005, revealed that the mass had again decreased significantly in size. (Tr. 337). It was later determined that the mass had "self-destroyed spontaneously by apoplexy." (Tr. 363).

Treatment notes from January 25, 2006, indicate that Woelk still had diplopia (double vision) and required the use of an eye patch in order to focus. (Tr. 238). At a September 8, 2006, office visit, ophthalmologist Patrick Dennehy noted that Woelk had tried "prism" glasses

to correct his double vision, but he did not like them. (Tr. 203). As a result, Woelk had been prescribed different glasses; however, he did not fill that prescription because he wanted to pursue possible surgical alternatives. (*Id.*). Dr. Dennehy advised Woelk to wait six months before considering surgical intervention and again suggested that Woelk try using prism glasses to correct his vision. (Tr. 203-04). Woelk apparently refused and opted to continue with his regular glasses. (Tr. 204). Two months later, Dr. Dennehy again noted that Woelk preferred not to occlude either eye or to wear prism glasses. (Tr. 200). He was advised to return in three months, at which point if his measurements remained stable, strabismus surgery would be scheduled. (*Id.*). Woelk returned to see Dr. Dennehy in April of 2007, continuing to complain of double vision, and indicating that, during most important tasks, he had to close one eye. (Tr. 197). At that point, Dr. Dennehy recommended surgery.[1] (*Id.*).

A follow-up MRI of Woelk's brain performed in November of 2006, looked "great," with "no regrowth." (Tr. 198, 333). However, MRI findings suggested that Woelk had panhypopituitarism (pituitary gland malfunction), and, as a result, he was prescribed hydrocortisone. (Tr. 236). At return visits to his endocrinologist in December of 2008 and June of 2009, there were no signs of a recurrence of the pituitary adenoma. (Tr. 195-96). Between June of 2009 and December 31, 2010 (the date last insured), Woelk did not receive any substantial treatment for his alleged impairments.

On March 12, 2012 (well after his date last insured (Tr. 135)), Woelk presented to Henry Ford Hospital with complaints of left-sided numbness and an unsteady gait. (Tr. 309-11). After undergoing CT imaging, Woelk was diagnosed with lung cancer that had metastasized into a brain tumor. (Tr. 229-30, 247). On March 22, 2012, Woelk underwent a craniotomy for

---

[1] Woelk testified, however, that he never had this surgery because he had no insurance and could not afford it. (Tr. 43).

removal of his brain tumor, and in subsequent months, he had radiation and chemotherapy to treat his cancer. (Tr. 256-58, 316).

A medical source statement completed by D. Wang, M.D. on July 20, 2012, indicated that Woelk's cognitive and emotional spheres of functioning were grossly intact, but were expected to worsen if and when his brain became more affected by cancer. (Tr. 369-72). Dr. Wang further opined that Woelk was mildly limited in certain respects in terms of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 369-70). Dr. Wang also opined that Woelk was not significantly limited in the ability to understand, remember, and carry out very simple instructions; make simple work-related decisions; or interact appropriately with the general public. (*Id.*).

### 3. Vocational Expert's Testimony

Harry Cynowa testified as an independent vocational expert ("VE"). (Tr. 60-66). The VE characterized Woelk's past relevant work as a mechanic and food service manager as skilled in nature and medium and light, respectively, in exertion. (Tr. 61). The ALJ asked the VE to imagine a claimant of Woelk's age, education, and work experience, who could perform:

> … medium exertional work as defined in the regulations; lifting and carrying up to 50 pounds occasionally, 25 pounds frequently, pushing and pulling as much as can be lifted or carried. I'm going to ask you to assume that our worker could frequently climb ramps and stairs, should never be required to climb ladders or scaffolds, but can frequently balance, stoop, kneel, crouch and crawl. I'm going to ask you that our worker has diplopia or double vision, that as a result the work should not require fine depth perception, binocular vision or fine peripheral vision. However, I also want to factor into that that the worker would be capable of seeing clearly by closing one eye, but obviously when that's done would lose the peripheral vision that would be provided by the other eye and in order to read would need to close one eye and lose the peripheral vision while reading. I want you to assume that our worker should not be exposed to unprotected heights.

(Tr. 62). The VE testified that the hypothetical individual would be capable of performing

6

Woelk's past relevant work as a food service manager. (Tr. 62-63). The VE also testified that the hypothetical individual would be capable of working in the positions of cleaner (10,000 jobs in southeastern Michigan) and kitchen helper (10,000 jobs). (*Id.*).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Woelk was not disabled under the Act during the relevant time period.[2] At Step One, the ALJ found that Woelk had not engaged in substantial gainful activity from December 20, 2004, his alleged onset date, through his date last insured of December 31, 2010. (Tr. 23). At Step Two, the ALJ found that, through the date last insured, Woelk had the severe impairments of pituitary macroadenoma with bilateral sixth cranial nerve palsy causing diplopia, and panhypopituitarism. (*Id.*). At Step Three, the ALJ found that these impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment. (*Id.*).

The ALJ then assessed Woelk's residual functional capacity ("RFC"), concluding that, during the relevant period, he was capable of performing medium exertional work, lifting and carrying up to 50 pounds occasionally, 25 pounds frequently, and pushing and pulling as much as could be lifted or carried; frequent climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; no work requiring fine depth perception, binocular vision, or fine peripheral vision (although he would be capable of seeing clearly and reading by closing one eye); and no exposure to unprotected heights. (Tr. 23-26).

At Step Four, the ALJ determined that, during the relevant time period, Woelk was capable of performing his past relevant work as a food service manager. (Tr. 26). Alternatively,

---

[2] *See* 42 U.S.C. §§216(i)(2) and 223(c)(1).

the ALJ concluded at Step Five, based in part on VE testimony, that Woelk was capable of performing the jobs of cleaner (10,000 jobs in southeastern Michigan) and kitchen helper (10,000 jobs). (Tr. 27). As a result, the ALJ concluded that Woelk was not disabled under the Act prior to his date last insured. (Tr. 27-28).

### E. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

8

examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**F.     Analysis**

As set forth above, the ALJ found that, during the relevant period of time, Woelk had the RFC to lift/carry up to 50 pounds occasionally and 25 pounds frequently; frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 23-24). With respect to Woelk's eye condition, the ALJ found that he could not work in a job that required fine depth perception, binocular vision, fine peripheral vision, or exposure to unprotected heights. (Tr. 24). The ALJ also noted, however, that Woelk was capable of seeing clearly and reading by closing one eye. (*Id.*).

Before this Court, Woelk advances only one argument: that the ALJ erred because he did not rely on any particular medical opinion in formulating his RFC assessment. (Doc. #12 at 8-10). Specifically, Woelk asserts:

9

> In this case, the *only* medical opinion on this record as to plaintiff's ability to work came from Dr. Wang, but the ALJ rejected that evidence as irrelevant (Tr. 25). The original denial of plaintiff's claim was based upon the opinions of a so-called "single decisionmaker," not a medical source (Tr. 68-73). The ALJ did not send plaintiff for a consultative examination, nor did he call a medical expert to offer opinions on the subject. Instead, he simply proceeded on his own, without medical evidence as to plaintiff's RFC despite the fact that this is a *medical* assessment. SSR 83-10.

(*Id.* at 9) (emphasis in original).

To begin with, Woelk did not *provide* any medical opinion from the relevant time period that established any workplace limitations arising from his impairments. The regulations explicitly provide that it is the claimant who bears the burden of establishing the existence of disability. *See* 20 C.F.R. §404.1512(c) ("You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled. You must provide evidence, without redaction, showing how your impairment(s) affects your functioning during the time you say that you are disabled, and any other information that we need to decide your claim."). In this case, Woelk offered only the opinion of Dr. Wang from July of 2012, which – as the ALJ correctly noted – was provided more than eighteen months after Woelk's date last insured (December 31, 2010). (Tr. 25, 369-72). The ALJ reasonably gave "little weight" to Dr. Wang's opinion because there was "no indication that any of the symptoms described by Dr. Wang in July 2012 had any affect [sic] on the claimant's ability to perform work as of the date last insured" (Tr. 25), and Woelk has not challenged the ALJ's decision in this respect.

In the absence of any relevant medical opinion indicating that Woelk had significant limitations, the ALJ partially credited Woelk's testimony and reasonably relied on the medical evidence in formulating his RFC. (Tr. 23-26). Specifically, the ALJ referenced Woelk's testimony that he stopped working in December of 2004 because he was experiencing frequent

10

headaches and double vision. (Tr. 24, 41-43). The ALJ further noted, however, that Woelk testified that his headaches stopped after he began treatment for his pituitary macroadenoma in 2005, and he was consistently able to see clearly if he closed one eye or wore an eye patch. (Tr. 26, 43). The ALJ also noted Woelk's testimony that, by May or June of 2005, he would have been able to work – including as a mechanic – if he had been able to find a job. (Tr. 26, 46-47). Moreover, the medical evidence revealed that Woelk's pituitary macroadenoma significantly decreased in size over time, and eventually it "self-destroyed spontaneously." (Tr. 24, 44, 363). And, as the ALJ correctly noted, Woelk received minimal treatment for his impairments between early 2006 and his date last insured (December 31, 2010). (Tr. 25-26).

The fact that the ALJ did not cite to any medical opinion in formulating his RFC – but, instead, relied on Woelk's testimony and the available medical evidence – is not *per se* grounds for error. The regulations provide that an ALJ is "responsible for assessing [a claimant's] residual functional capacity" and should make such an assessment "based on all of the relevant medical and other evidence." *See* 20 C.F.R. §§404.1545(a)(3), 404.1546(c). Social Security Ruling 96-5p defines an RFC assessment as the adjudicator's ultimate finding about the ability of an individual to perform work-related activities, based upon "consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." *Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

Woelk cites two unpublished Eastern District of Michigan cases in support of his argument that an ALJ must always rely on a medical opinion in support of his RFC finding:

11

*Sparck v. Comm'r of Soc. Sec.*, 2012 WL 4009650, at *9 (E.D. Mich. Aug. 23, 2012), and *Wyatt v. Comm'r of Soc. Sec.*, 2013 WL 4483074, at *16-17 (E.D. Mich. Aug. 19, 2013). (Doc. #12 at 9-10). In *Sparck*, the magistrate judge noted that "courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data." *Id.* at *9 (citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)). The *Sparck* court further quoted *Deskin*, 605 F. Supp. 2d at 912, saying:

> An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capacities such as those set out in 20 C.F.R. §404.1567(a) … [the Commissioner may not] make the connection himself.

*Sparck*, 2012 WL 4009650, at *9 (internal quotations omitted). Thus, *Deskin* was relied on by the *Sparck* court for the proposition that, "In making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms."[3] *Id.* at 912.

Subsequently, however, the judge who authored *Deskin* explained that "[p]roperly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test." *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011). He then offered this clarification:

> [The rule of *Deskin*] potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical

---

[3] Recently, however, in *Sneed v. Comm'r of Soc. Sec.*, 2014 WL 861525, at *21-22 (E.D. Mich. Mar. 5, 2014), now-District Judge Michelson noted that *Deskin* was criticized in *Henderson v. Comm'r of Soc. Sec.*, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010). In *Henderson*, the court explicitly stated "that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." *Id.* Thus, there is certainly debate about the soundness of the *Deskin* decision.

> body of objective medical evidence. The ALJ retains discretion to impose work-related limitations without a proper source opinion where [] the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Id.* at *2. Indeed, in one of the cases relied on by Woelk, this court recently reiterated the rule that "ALJs can make their own functional capacity determinations from the medical evidence when a claimant has little physical impairment." *Wyatt*, 2013 WL 4483074, at *16 (citing *Mitsoff v. Comm'r of Soc. Sec.*, 2013 WL 1098188, at *9 (S.D. Ohio Mar. 15, 2013) ("The Court recognizes there are limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source.")).

Here, the Court need not decide whether to adopt the rule first set forth in *Deskin*, as subsequently clarified in *Kizys*, because this case falls outside the "narrow rule" established by these decisions. This is not a case where the ALJ was interpreting "raw medical data" (such as MRI results, for example) and translating that data into functional limitations. *See Deskin*, 605 F. Supp. 2d at 912. Rather, as discussed more fully above, the evidence established that Woelk had an eye problem, and the ALJ reasonably relied on the medical treatment notes – as well as Woelk's own testimony – in formulating an RFC assessment that accounted for Woelk's vision difficulties. Specifically, the ALJ restricted Woelk from working in an environment that would require fine depth perception, binocular vision, fine peripheral vision, or work at unprotected heights.[4] (Tr. 23-24). Thus, this is a case where the record reveals "relatively little physical impairment" during the relevant time period, such that the ALJ was capable of rendering a "commonsense judgment" about Woelk's functional capacity based on available treatment notes and Woelk's own testimony. *See Kizys*, 2011 WL 5024866, at *2; *see also Sneed*, 2014 WL

---

[4] The ALJ also credited Woelk's complaints by restricting his ability to perform certain postural maneuvers. (Tr. 23-24).

13

861525, at *22. As discussed above, the ALJ made appropriate use of the medical evidence (and lack thereof) and testimony in drawing his conclusions. *Supra* at 10-11. In short, Woelk has not established that the ALJ erred in determining his RFC in the absence of a medical opinion from the relevant time period.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Woelk's Motion for Summary Judgment **[12]** be **DENIED**, the Commissioner's Motion **[14]** be **GRANTED**, and this case be **AFFIRMED**.

Dated: May 15, 2014                                 s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                                                United States Magistrate Judge

### REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 15, 2014.

                                                s/Eddrey O. Butts
                                                EDDREY O. BUTTS
                                                Case Manager